# Exhibit 9

MARK   WILSON 10/12/2011

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

* * *

DUSTIN SWIGART and

SONIA SCHULTZ, on behalf

of themselves and all other

similarly situated employees,

and on behalf of the proposed

Ohio Rule 23 Class,

      Plaintiffs,

      vs.          CASE NO. 1:11-cv-00033-SJD

FIFTH THIRD BANK,

      Defendant.

* * *

Deposition of MARK WILSON, 30(b)(6)

Witness herein, called by the Plaintiffs for

cross-examination pursuant to the Rules of Civil

Procedure, taken before me, Karen M. Rudd, a

Notary Public in and for the State of Ohio, at the

offices of Jackson Lewis, 201 East Fifth Street,

Suite 2600, Cincinnati, Ohio, on Wednesday,

October 12, 2011, at 9:01 a.m.

* * *

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | partner. | 09:04:36 |
| 2 | Q.   And what are your job duties as a | 09:04:36 |
| 3 | human resources business partner? | 09:04:42 |
| 4 | A.   Really working with the line of | 09:04:42 |
| 5 | business to drive the people-related strategies | 09:04:44 |
| 6 | that align to the business strategies. | 09:04:48 |
| 7 | Q.   What line of business? | 09:04:50 |
| 8 | A.   Currently it's with retail line of | 09:04:50 |
| 9 | business, which has responsibility for all of | 09:04:57 |
| 10 | Fifth Third's branches. | 09:04:57 |
| 11 | Q.   Does that include the mortgage | 09:04:57 |
| 12 | line of business? | 09:04:58 |
| 13 | A.   No. | 09:04:59 |
| 14 | Q.   Was that previously the line of | 09:04:59 |
| 15 | business that you were responsible for? | 09:05:03 |
| 16 | A.   Yes. | 09:05:04 |
| 17 | Q.   When did that change? | 09:05:05 |
| 18 | A.   April of this year, 2011. | 09:05:07 |
| 19 | Q.   Who took over that responsibility? | 09:05:10 |
| 20 | A.   Her name is Lisa Brown. | 09:05:13 |
| 21 | Q.   When you -- when did you start | 09:05:17 |
| 22 | with Fifth Third Bank? | 09:05:24 |
| 23 | A.   October 31, 2005. | 09:05:25 |
| 24 | Q.   And when you started on | 09:05:28 |
| 25 | October 31, 2005, were you a human -- was your | 09:05:33 |

MARK   WILSON 10/12/2011

Page 9

| | | |
|---|---|---|
| 1 | job title human resources business partner? | 09:05:37 |
| 2 | A.   That's correct.  Yes. | 09:05:38 |
| 3 | Q.   And did you have at that time | 09:05:39 |
| 4 | responsibility for the mortgage line of | 09:05:41 |
| 5 | business? | 09:05:44 |
| 6 | A.   Yes. | 09:05:44 |
| 7 | Q.   And am I referring to that | 09:05:45 |
| 8 | correctly, mortgage line of business, or would | 09:05:46 |
| 9 | you refer to it differently? | 09:05:49 |
| 10 | A.   Line of business is correct, yes. | 09:05:50 |
| 11 | Q.   Mortgage line of business.  Okay. | 09:05:52 |
| 12 | And does the mortgage line of business include | 09:05:55 |
| 13 | retail, wholesale, and direct lending? | 09:05:58 |
| 14 | A.   Yes. | 09:06:03 |
| 15 | Q.   All three are under -- were | 09:06:03 |
| 16 | under -- you had responsibility for all three? | 09:06:06 |
| 17 | A.   Yes, except for retail.  The way | 09:06:08 |
| 18 | that we are structured is that retail rolls | 09:06:11 |
| 19 | into the affiliate structure.  So the direct | 09:06:13 |
| 20 | lines of business that I had would be the | 09:06:15 |
| 21 | mortgage line of business, wholesale, and | 09:06:17 |
| 22 | direct. | 09:06:20 |
| 23 | Q.   So retail -- when you say | 09:06:22 |
| 24 | affiliates, do you mean bank branches? | 09:06:26 |
| 25 | A.   The way our affiliate structure | 09:06:29 |

MARK   WILSON 10/12/2011

Page 13

| | | |
|---|---|---|
| 1 | Q.   When did Mr. Lewis replace | 09:10:16 |
| 2 | Mr. Greenlee? | 09:10:21 |
| 3 | A.   I'm not sure exactly when | 09:10:21 |
| 4 | Mr. Greenlee left, but Bob Lewis was made the | 09:10:23 |
| 5 | interim president of the mortgage company until | 09:10:25 |
| 6 | he was finally promoted to the role.  I'm | 09:10:28 |
| 7 | thinking that was probably the latter portion | 09:10:33 |
| 8 | of 2006. | 09:10:36 |
| 9 | Q.   Is Susan Makris still with the | 09:10:37 |
| 10 | company? | 09:10:45 |
| 11 | A.   No. | 09:10:45 |
| 12 | Q.   Do you know when she left the | 09:10:45 |
| 13 | company? | 09:10:45 |
| 14 | A.   No. | 09:10:46 |
| 15 | Q.   What about Stuart Greenlee? | 09:10:46 |
| 16 | A.   No longer with the company. | 09:10:53 |
| 17 | Q.   Any other differences between | 09:10:55 |
| 18 | October 2005 and the date on this document, | 09:10:59 |
| 19 | March 20, 2009? | 09:11:05 |
| 20 | A.   Yes.  One of the pieces that's | 09:11:07 |
| 21 | missing here is we had a retail channel | 09:11:10 |
| 22 | manager, and that responsibility -- person had | 09:11:15 |
| 23 | responsibility for really driving sales | 09:11:17 |
| 24 | products and programs for the retail MLO's and | 09:11:19 |
| 25 | the MLO's and the affiliates. | 09:11:23 |

MARK   WILSON 10/12/2011

Page 16

| | | |
|---|---|---|
| 1 | retail now. | 09:14:25 |
| 2 | Q. And that was Lisa Brown that | 09:14:27 |
| 3 | replaced you in April? | 09:14:29 |
| 4 | A. Yes. | 09:14:30 |
| 5 | Q. Okay. Well, that wasn't as hard | 09:14:31 |
| 6 | as I thought it was going to be. Thank you. I | 09:14:39 |
| 7 | think I'm done with that. | 09:14:42 |
| 8 | We talked about the chain of | 09:14:57 |
| 9 | command that you are underneath. Let's talk | 09:14:58 |
| 10 | about the chain of command for loan officers. | 09:15:01 |
| 11 | You mentioned retail MLO's. And let me take | 09:15:09 |
| 12 | one step back and just say when I refer to loan | 09:15:14 |
| 13 | officers, I'm referring to Fifth Third's | 09:15:17 |
| 14 | mortgage loan originators, okay? | 09:15:19 |
| 15 | A. Okay. Can we clarify that? | 09:15:21 |
| 16 | Q. Sure. What does -- why don't you | 09:15:22 |
| 17 | explain to me the -- what the term mortgage | 09:15:26 |
| 18 | loan originator means to you. | 09:15:31 |
| 19 | A. The way I would classify it, the | 09:15:34 |
| 20 | mortgage loan originators that we have would be | 09:15:38 |
| 21 | our retail channel and our direct channel. | 09:15:40 |
| 22 | Q. Okay. What is the difference | 09:15:47 |
| 23 | between the two? | 09:15:53 |
| 24 | A. The retail channel LO's work | 09:15:53 |
| 25 | within the affiliates and normally would be | 09:16:03 |

MARK  WILSON 10/12/2011

Page 17

```
 1    assigned to the branch or financial center        09:16:03

 2    network.                                           09:16:06

 3            Q.    Okay.                                 09:16:09

 4            A.    The direct channel LO's are part      09:16:09

 5    of our inside mortgage sales group.                09:16:11

 6            Q.    Where do direct MLO's work or         09:16:16

 7    direct loan officers work?                         09:16:33

 8            A.    The direct LO's that we have          09:16:33

 9    within the bank currently work in Cincinnati at    09:16:33

10    our Madisonville location.                         09:16:35

11            Q.    You mentioned that the retail loan    09:16:38

12    officers would be assigned to a bank branch or     09:16:50

13    a financial center network.  Can you explain       09:16:53

14    that to me?                                        09:16:56

15            A.    Sure.  Either assigned to a branch    09:16:56

16    or working as -- out of their home office.  And    09:17:00

17    really a lot of it depends on the overall          09:17:04

18    financial plan for the affiliate.  Each            09:17:07

19    affiliate has an affiliate president, an           09:17:09

20    affiliate mortgage exec, that's responsible for    09:17:13

21    their profit and loss statement.  So it's          09:17:15

22    really upon them in terms of what staffing         09:17:17

23    levels they would have in terms of number of       09:17:19

24    LO's that would be assigned to a branch or the     09:17:22

25    number of MLO's that would be working in the       09:17:24
```

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | market. | 09:17:27 |
| 2 | Q.   Do the loan officers that are | 09:17:29 |
| 3 | assigned to a bank actually have an office or a | 09:17:31 |
| 4 | cubicle in the bank? | 09:17:37 |
| 5 | A.   Sometimes they do. | 09:17:39 |
| 6 | Q.   But when you say financial -- when | 09:17:40 |
| 7 | you said financial center network, that didn't | 09:17:45 |
| 8 | refer to a separate actual physical location | 09:17:47 |
| 9 | other than a bank branch? | 09:17:50 |
| 10 | A.   The way that Fifth Third calls its | 09:17:52 |
| 11 | branches is often referred to as financial | 09:17:54 |
| 12 | centers. | 09:17:56 |
| 13 | Q.   There's not a Fifth Third mortgage | 09:17:57 |
| 14 | building, though, that loan officers -- only | 09:18:00 |
| 15 | loan officers would be working at, is there? | 09:18:03 |
| 16 | A.   In some locations we call those | 09:18:04 |
| 17 | loan production offices. | 09:18:06 |
| 18 | Q.   Okay.  Do you know which | 09:18:08 |
| 19 | affiliates have loan production offices? | 09:18:19 |
| 20 | A.   No. | 09:18:19 |
| 21 | Q.   So the retail loan officers, who | 09:18:19 |
| 22 | do they report to? | 09:18:35 |
| 23 | A.   They would report to an area sales | 09:18:37 |
| 24 | manager. | 09:18:39 |
| 25 | Q.   I have seen the acronym ASM. | 09:18:39 |

MARK  WILSON 10/12/2011

| | |
|---|---|
| 1      Q.   Okay.  Who was the COO? | 09:21:04 |
| 2      A.   The COO in question, when you are | 09:21:07 |
| 3  looking at the org chart, this is the company | 09:21:10 |
| 4  mortgage COO.  When I mentioned COO there, | 09:21:13 |
| 5  that's the COO for the bank. | 09:21:16 |
| 6      Q.   So there's -- is there some sort | 09:21:21 |
| 7  of reporting relationship that would combine | 09:21:27 |
| 8  these two charts essentially? | 09:21:32 |
| 9      A.   It's part of our unique culture | 09:21:34 |
| 10  with the affiliate model.  If anything, you | 09:21:36 |
| 11  would probably see a dotted line between the | 09:21:40 |
| 12  affiliate mortgage exec to the mortgage company | 09:21:42 |
| 13  president, but it's very much, I would say, a | 09:21:46 |
| 14  weak dotted line, if any. | 09:21:49 |
| 15      Q.   What are the -- can you describe | 09:22:03 |
| 16  the job duties of the ASM 1 for me? | 09:22:06 |
| 17      A.   Sure.  They have responsibilities | 09:22:09 |
| 18  for loan production, so anything that a retail | 09:22:12 |
| 19  MLO would have responsibility for, and they are | 09:22:16 |
| 20  also responsible for managing, coaching, their | 09:22:19 |
| 21  direct reports. | 09:22:23 |
| 22      Q.   On what? | 09:22:24 |
| 23      A.   Sales, sales process, coaching on | 09:22:25 |
| 24  improved sales results, development, some | 09:22:30 |
| 25  training.  Our ASM's would also probably do | 09:22:35 |

MARK   WILSON 10/12/2011

Page 22

| | | |
|---|---|---|
| 1 | sales calls with the MLO's to do kind of | 09:22:40 |
| 2 | just-in-time feedback around how a presentation | 09:22:42 |
| 3 | went, et cetera. | 09:22:45 |
| 4 | Q.   And what would the -- with respect | 09:22:46 |
| 5 | to the ASM 1, are there -- is there a | 09:22:52 |
| 6 | particular compensation plan for an ASM 1? | 09:22:56 |
| 7 | A.   Yes. | 09:23:00 |
| 8 | Q.   And are there goals related to | 09:23:01 |
| 9 | loan -- their own loan volume and number of | 09:23:05 |
| 10 | loans or some combination thereof? | 09:23:09 |
| 11 | A.   Yes. | 09:23:12 |
| 12 | Q.   And then do they also have goals | 09:23:12 |
| 13 | for the LO's that are reporting to them? | 09:23:15 |
| 14 | A.   Yes. | 09:23:18 |
| 15 | Q.   What are the job duties of the ASM | 09:23:19 |
| 16 | 2, the non-producing sales manager? | 09:23:24 |
| 17 | A.   Very similar to the ASM 1, but | 09:23:26 |
| 18 | without the MLO component.  So there's no | 09:23:29 |
| 19 | personal production expectations for an ASM 2. | 09:23:37 |
| 20 | Q.   And then the ASM 3? | 09:23:37 |
| 21 | A.   The ASM 3, the same thing, no | 09:23:38 |
| 22 | personal production expectations, but the | 09:23:41 |
| 23 | nuance there is that they may also be managing | 09:23:44 |
| 24 | other ASM's versus just LO's. | 09:23:46 |
| 25 | Q.   Other than this case, are you | 09:24:14 |

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | Judicial Notice.  If you could turn to the last | 09:31:54 |
| 2 | page, page three.  Is that your signature? | 09:31:56 |
| 3 | A.    Yes, it is. | 09:32:00 |
| 4 | Q.    And did you review this document | 09:32:01 |
| 5 | before you signed it? | 09:32:04 |
| 6 | A.    Yes, I did. | 09:32:05 |
| 7 | Q.    I have got a few questions about | 09:32:06 |
| 8 | this.  Let's just march through some of the | 09:32:12 |
| 9 | paragraphs here.  Paragraph two, you say you | 09:32:16 |
| 10 | became familiar with the job duties of the | 09:32:21 |
| 11 | bank's retail mortgage loan officers through | 09:32:27 |
| 12 | the course of your employment.  How did you | 09:32:27 |
| 13 | become familiar with their job duties? | 09:32:30 |
| 14 | A.    Very early on when I started, I | 09:32:32 |
| 15 | actually shadowed an MLO for half a day. | 09:32:36 |
| 16 | Q.    Anything else? | 09:32:43 |
| 17 | A.    I mean, through the course of my | 09:32:43 |
| 18 | responsibilities as HR business partner, to be | 09:32:46 |
| 19 | successful in that role, you have to know the | 09:32:49 |
| 20 | ins and outs of the business.  So being | 09:32:52 |
| 21 | involved on various projects related to the | 09:32:56 |
| 22 | retail MLO population throughout the time that | 09:32:57 |
| 23 | I was supporting mortgage. | 09:33:02 |
| 24 | Q.    You have never performed the job | 09:33:03 |
| 25 | duties of a loan officer, though, right? | 09:33:06 |

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | A.    That's correct. | 09:33:08 |
| 2 | Q.    And you have never managed or | 09:33:08 |
| 3 | supervised their work, right? | 09:33:10 |
| 4 | A.    That's correct. | 09:33:11 |
| 5 | Q.    Have you ever -- aside from that | 09:33:12 |
| 6 | day where you shadowed a mortgage loan officer, | 09:33:16 |
| 7 | did you ever have conversations with a loan | 09:33:21 |
| 8 | officer about their job duties? | 09:33:28 |
| 9 | A.    I think maybe once or twice. | 09:33:32 |
| 10 | Q.    Do you recall those circumstances? | 09:33:35 |
| 11 | A.    No. | 09:33:37 |
| 12 | Q.    What about conversations with | 09:33:37 |
| 13 | them, and again I'm talking about prior to | 09:33:44 |
| 14 | March 24, 2010, any conversations with them | 09:33:47 |
| 15 | about the number of hours they were working? | 09:33:51 |
| 16 | A.    No. | 09:33:54 |
| 17 | Q.    I have seen reference in the | 09:33:54 |
| 18 | documents that Fifth Third has produced in this | 09:34:02 |
| 19 | case to different job codes for loan officers | 09:34:06 |
| 20 | and varying -- slight variations in the job | 09:34:11 |
| 21 | title, and I'm going to list them off.  And if | 09:34:16 |
| 22 | you could, when I'm finished, explain any | 09:34:19 |
| 23 | differences, if there are any. | 09:34:22 |
| 24 | I have seen a reference to an | 09:34:24 |
| 25 | emerging market loan officer, a unit loan | 09:34:26 |

MARK   WILSON 10/12/2011

Page 35

| | | |
|---|---|---|
| 1 | an outside loan officer? | 09:39:19 |
| 2 | A.   It all depends on how we are | 09:39:20 |
| 3 | defining the terms again.  So I go back to I | 09:39:27 |
| 4 | would clarify outside meaning a unit MLO could | 09:39:30 |
| 5 | be generating all of his or her business from | 09:39:36 |
| 6 | the outside, absolutely. | 09:39:39 |
| 7 | Q.   So do outside MLO's only generate | 09:39:41 |
| 8 | their business from outside the bank? | 09:39:45 |
| 9 | A.   I would say the majority.  The | 09:39:49 |
| 10 | expectation is that the majority of the | 09:39:51 |
| 11 | business should come from outside resources, | 09:39:53 |
| 12 | but they also work closely with our branches. | 09:39:55 |
| 13 | Q.   How many -- in October 2005, how | 09:39:58 |
| 14 | many loan officers overall, and I want to | 09:40:04 |
| 15 | exclude the wholesale, overall how many loan | 09:40:07 |
| 16 | officers did Fifth Third employ? | 09:40:13 |
| 17 | A.   I'd say roughly 1,100. | 09:40:14 |
| 18 | Q.   Of those 1,100, what percent or | 09:40:17 |
| 19 | what number would you assign to inside versus | 09:40:21 |
| 20 | outside based on your best knowledge? | 09:40:24 |
| 21 | A.   I'm not sure. | 09:40:26 |
| 22 | Q.   I have also seen reference to | 09:40:37 |
| 23 | banking center mortgage loan originator.  Where | 09:41:34 |
| 24 | would you classify that loan originator in | 09:41:37 |
| 25 | this -- in terms of the inside versus outside | 09:41:39 |

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | that are needed to put the loan through? | 10:02:53 |
| 2 | A.   Yes. | 10:02:54 |
| 3 | Q.   And is that something that both | 10:02:55 |
| 4 | inside and outside loan officers would do? | 10:03:02 |
| 5 | A.   Yes. | 10:03:04 |
| 6 | Q.   And then there's a reference to | 10:03:04 |
| 7 | cross-selling other financial services offered | 10:03:13 |
| 8 | by the bank.  Describe that for me. | 10:03:13 |
| 9 | A.   Really the way that the cross-sell | 10:03:16 |
| 10 | piece would look at would -- if I'm an LO | 10:03:18 |
| 11 | sitting in a branch, and I have a closing | 10:03:22 |
| 12 | coming up with a customer, the best way to do a | 10:03:24 |
| 13 | cross-sell would be to invite the personal | 10:03:28 |
| 14 | banker to that closing.  So the MLO can make a | 10:03:30 |
| 15 | warm handoff to the personal banker and | 10:03:33 |
| 16 | hopefully the personal banker would be able to | 10:03:36 |
| 17 | sell the customer additional products. | 10:03:38 |
| 18 | Say throughout the loan process, | 10:03:40 |
| 19 | one of the things that the MLO's do is they | 10:03:42 |
| 20 | talk about other products that we do sell, but | 10:03:44 |
| 21 | really it's the personal bank or other people | 10:03:48 |
| 22 | within the financial center that would actually | 10:03:50 |
| 23 | sell those products. | 10:03:53 |
| 24 | Q.   Do loan officers receive any type | 10:03:54 |
| 25 | of pay if a borrower ends up using those or | 10:03:57 |

MARK   WILSON 10/12/2011

Page 54

| | | |
|---|---|---|
| 1 | purchasing those products from Fifth Third? | 10:04:03 |
| 2 | A.   Can you clarify the time period? | 10:04:05 |
| 3 | Q.   '05 to 2010, March 2010? | 10:04:06 |
| 4 | A.   We have a system called Team Fifth | 10:04:12 |
| 5 | Third, which is a referral system.  It's open | 10:04:15 |
| 6 | to all employees.  So if I know somebody, a | 10:04:18 |
| 7 | friend, that's looking for a credit card, and I | 10:04:20 |
| 8 | put it into Team 5/3 and refer it to a | 10:04:23 |
| 9 | financial center, I may get 10 or $25 if the | 10:04:26 |
| 10 | account is opened.  So that was in place during | 10:04:29 |
| 11 | that time period. | 10:04:31 |
| 12 | Q.   It's no longer in place? | 10:04:31 |
| 13 | A.   For MLO's, no. | 10:04:33 |
| 14 | Q.   I have also seen reference to | 10:04:34 |
| 15 | something called a One Bank strategy.  Are you | 10:04:42 |
| 16 | familiar with that phrase? | 10:04:45 |
| 17 | A.   Yes. | 10:04:46 |
| 18 | Q.   Can you describe what that means | 10:04:46 |
| 19 | to you? | 10:04:48 |
| 20 | A.   Really, the crux of One Bank is | 10:04:48 |
| 21 | making sure the right hand and the left hand | 10:04:52 |
| 22 | know what each other is doing and really | 10:04:55 |
| 23 | presenting holistic solutions to the customer. | 10:04:57 |
| 24 | So instead of product pushing, it's really | 10:05:00 |
| 25 | around pushing the right financial solutions | 10:05:02 |

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | business plan? | 10:08:16 |
| 2 | A.   Yes. | 10:08:16 |
| 3 | MR. SELANDER:  Mark that. | 10:08:30 |
| 4 | (Thereupon, Plaintiffs' Exhibit 5, | 10:08:30 |
| 5 | document entitled Fifth Third Bank One Bank | 10:08:30 |
| 6 | Addendum, was marked for purposes of | 10:08:30 |
| 7 | identification.) | 10:08:59 |
| 8 | BY MR. SELANDER: | 10:08:59 |
| 9 | Q.   The court reporter has handed you | 10:09:08 |
| 10 | Exhibit 5, which should be Defendant's Bates | 10:09:10 |
| 11 | labeled 469 through 478.  Do you have those | 10:09:18 |
| 12 | pages? | 10:09:31 |
| 13 | A.   Yes. | 10:09:31 |
| 14 | Q.   The first page of this document is | 10:09:31 |
| 15 | the title page, and it says Fifth Third Bank | 10:09:31 |
| 16 | One Bank Addendum.  And I wanted to -- if you | 10:09:33 |
| 17 | could turn your attention to the second page. | 10:09:37 |
| 18 | There's a reference at the top there to the One | 10:09:43 |
| 19 | Bank program accompaniments to the Fifth Third | 10:09:45 |
| 20 | Mortgage Company's existing sales process.  Do | 10:09:49 |
| 21 | you see that? | 10:09:52 |
| 22 | A.   Yes. | 10:09:53 |
| 23 | Q.   And it says that this | 10:09:53 |
| 24 | accompaniment is non-negotiable.  What does | 10:09:56 |
| 25 | that mean? | 10:09:59 |

MARK   WILSON 10/12/2011

Page 58

```
 1          A.   Non-negotiable is what I would      10:10:00
 2   call a cultural term that we use within Fifth   10:10:09
 3   Third saying, you know, this is something that  10:10:12
 4   really is not for discussion.  This is our      10:10:14
 5   process and how we are going to go about it.    10:10:17
 6          Q.   Below that it says that the One     10:10:22
 7   Bank strategy works to complement our existing  10:10:26
 8   mortgage sales process, and that it's           10:10:29
 9   interlaced with the following structure,        10:10:32
10   prepare and prospect, lead generation and lead  10:10:36
11   conversion, assess needs, recommend solutions,  10:10:39
12   close the sale and implement solutions, follow  10:10:42
13   through.  That process described there, that's  10:10:46
14   the mortgage sales process at Fifth Third,      10:10:51
15   correct?                                        10:10:53
16          A.   No, this is the One Bank sales      10:10:53
17   process.                                        10:10:55
18          Q.   So what is the existing sales       10:10:58
19   process?                                        10:11:00
20          A.   The existing sales process that we  10:11:02
21   have in place, really it would be similar, but  10:11:04
22   as part of the One Bank team, this is the       10:11:10
23   process, the prepare and prospect, assess       10:11:17
24   needs, recommend solutions, close the sale and  10:11:17
25   implement solutions, and follow through, the    10:11:17
```

MARK   WILSON 10/12/2011

Page 59

```
 1    same sales process for all the lines of          10:11:19

 2    business that are part of One Bank.               10:11:21

 3         Q.   So that these steps occur in the        10:11:23

 4    mortgage sales process, correct?                  10:11:26

 5         A.   Yes.                                     10:11:27

 6              MR. HALL:  Objection to the form         10:11:28

 7    of the question.                                  10:11:30

 8              THE WITNESS:  Yes.                       10:11:32

 9    BY MR. SELANDER:                                  10:11:32

10         Q.   As we go through the document,          10:11:33

11    would you agree that this is explaining how the   10:11:39

12    One Bank program is integrated into the           10:11:43

13    mortgage sales process?                           10:11:48

14         A.   Yes.                                     10:11:49

15         Q.   So the preparation -- if you look       10:11:50

16    on the second page, the same page we were just    10:12:24

17    looking at, under prepare and prospect, there's   10:12:33

18    a square bullet point there that says             10:12:35

19    preparation for follow up with an existing        10:12:37

20    customer includes review of financial needs       10:12:39

21    assessment and financial summary, as well as      10:12:41

22    current products and services on ACE.             10:12:44

23              Is that part of the process that        10:12:52

24    we discussed earlier today where the loan         10:12:56

25    officer is sitting down with the potential        10:13:00
```

MARK   WILSON 10/12/2011

Page 63

| | | |
|---|---|---|
| 1 | Q.   If you could look again at | 10:29:08 |
| 2 | Exhibit 5, just on the first page there.  In | 10:29:10 |
| 3 | the upper right-hand corner, it says mortgage | 10:29:13 |
| 4 | MLO playbook.  What is the mortgage MLO | 10:29:15 |
| 5 | playbook? | 10:29:18 |
| 6 | A.   The playbook is something that we | 10:29:19 |
| 7 | put together I think maybe early 2005 that | 10:29:21 |
| 8 | talks about all the things that an MLO needs to | 10:29:26 |
| 9 | do to be a successful originator at Fifth | 10:29:29 |
| 10 | Third. | 10:29:33 |
| 11 | Q.   And let's see here, this is an | 10:29:33 |
| 12 | addendum, which suggests that it was added at a | 10:29:38 |
| 13 | later date.  On the bottom right -- bottom left | 10:29:41 |
| 14 | corner it says April 21, 2009.  Do you see | 10:29:44 |
| 15 | that? | 10:29:47 |
| 16 | A.   Yes, I do.  And I'm a little | 10:29:47 |
| 17 | concerned on that date.  That doesn't look | 10:29:50 |
| 18 | correct from my recollection. | 10:29:51 |
| 19 | Q.   Based on what? | 10:29:54 |
| 20 | A.   The One Bank sales process didn't | 10:29:55 |
| 21 | start until probably -- the development of the | 10:29:58 |
| 22 | sales process didn't probably start until the | 10:30:01 |
| 23 | third quarter of 2009.  We rolled out pilots | 10:30:03 |
| 24 | beginning of 2010, and then all affiliates were | 10:30:07 |
| 25 | on the One Bank sales process as of | 10:30:10 |

MARK  WILSON 10/12/2011

Page 67

```
 1            Q.   Okay.  So the two there, there's       10:33:45
 2   really no difference between those two?             10:33:48
 3            A.   Between which two?                     10:33:50
 4            Q.   The inside that might be working       10:33:52
 5   primarily in a bank branch and the outside that     10:33:55
 6   would apparently not have a bank branch, might      10:33:58
 7   be working out of the home office?                  10:34:01
 8            A.   Yes.  Duties and responsibilities      10:34:02
 9   would be the same, yes.                             10:34:03
10            Q.   But obviously the location might       10:34:04
11   be different?                                       10:34:07
12            A.   Yes.                                   10:34:07
13            Q.   And then there was the emerging        10:34:07
14   market loan officer who has the same job duties     10:34:13
15   as the inside bank branch and outside mortgage      10:34:21
16   loan originator, right?                             10:34:26
17            A.   Right.                                 10:34:27
18            Q.   But they focus on a different area     10:34:27
19   of or sector of the economy?                        10:34:29
20            A.   Yes.                                   10:34:31
21            Q.   And then there is the unit             10:34:32
22   mortgage loan originator who is compensated         10:34:35
23   based on number of loans sold, but not volume?      10:34:39
24            A.   Correct.                               10:34:45
25            Q.   And that unit mortgage loan            10:34:45
```

MARK  WILSON 10/12/2011

Page 72

| | |
|---|---|
| 1 really in that initial meeting and the contact | 10:39:57 |
| 2 that you have with them, and then after that -- | 10:40:00 |
| 3 in determining what their needs are, and then | 10:40:03 |
| 4 after that it's not really a sales process any | 10:40:05 |
| 5 longer.  Is that what you are saying? | 10:40:08 |
| 6            MR. HALL:  Objection to the form | 10:40:09 |
| 7 of the question, mischaracterizes the witness's | 10:40:10 |
| 8 testimony. | 10:40:12 |
| 9            THE WITNESS:  From a mortgage | 10:40:12 |
| 10 perspective, that would be correct. | 10:40:13 |
| 11 BY MR. SELANDER: | 10:40:16 |
| 12       Q.   Okay.  But from the non-negotiable | 10:40:16 |
| 13 One Bank sales process, the sales process | 10:40:18 |
| 14 really continues all the way to closing, right? | 10:40:21 |
| 15       A.   Yes. | 10:40:23 |
| 16       Q.   Why is there a difference there? | 10:40:23 |
| 17       A.   A difference between? | 10:40:28 |
| 18       Q.   Between the sales process, One | 10:40:29 |
| 19 Bank, continuing all the way to closing, like | 10:40:32 |
| 20 this document suggests, and then a sales | 10:40:34 |
| 21 process for mortgage that ends after that | 10:40:36 |
| 22 initial meeting and the needs are determined. | 10:40:41 |
| 23       A.   When you say leads are determined, | 10:40:44 |
| 24 that's different than the sales process.  The | 10:40:46 |
| 25 scenario that I walked through, the customer is | 10:40:49 |

MARK   WILSON 10/12/2011

Page  73

```
 1   already at the table, so there's no lead          10:40:51

 2   generation needed from that, that perspective,    10:40:52

 3   in terms of getting leads to actually close       10:40:54

 4   those customers.                                  10:40:57

 5            The reason why there's two               10:40:58

 6   separate processes is that, you know, one is      10:41:00

 7   mortgage specific.  One would be -- potentially   10:41:01

 8   could go off in several different areas           10:41:04

 9   depending on the type of product and the type     10:41:06

10   of referral that is being made.                   10:41:08

11            So the sales portion, if I get a         10:41:09

12   1003 and go through that process, that sales      10:41:13

13   piece is complete upon close of the loan.  But    10:41:16

14   there's other sales processes that could          10:41:20

15   continue on while the loan is in process.  The    10:41:22

16   loan could take anywhere from 30 to 60 days to    10:41:26

17   get processed.                                    10:41:28

18       Q.   Okay.  So I just want to be clear.       10:41:29

19   You said the sales process could continue --      10:41:34

20   the mortgage sales process could continue to      10:41:37

21   closing; is that right?                           10:41:39

22       A.   It all depends.  I mean, how would       10:41:40

23   you define sales for this?                        10:41:42

24       Q.   How would you define sales?              10:41:45

25       A.   I mean, for our purposes, once the       10:41:46
```

MARK   WILSON 10/12/2011

Page 74

```
 1   loan has closed is when the MLO would get          10:41:54
 2   compensation for it.  So also MLO's would look      10:41:58
 3   at the application being a sale.  So I made a       10:42:03
 4   sales call, I got an application, and if they       10:42:07
 5   are working through the process, that could         10:42:10
 6   also be perceived from an MLO's perspective as      10:42:11
 7   a sale.                                             10:42:14
 8            So there's the aspect of close            10:42:16
 9   business, which I mentioned, and there's also       10:42:19
10   the aspect that, you know what, I was able to       10:42:21
11   turn a prospect into a customer.  To me, that's     10:42:23
12   a sale in itself, as well.                          10:42:27
13            Q.   We talked about how MLO's are        10:42:29
14   paid, they are either draw plus commission or       10:43:11
15   salary plus commission, prior to the                10:43:14
16   reclassification.  Do you agree that the amount     10:43:16
17   of those commissions is based on the number and     10:43:21
18   volume or some combination thereof of loans         10:43:24
19   that they have sold to borrowers?                   10:43:27
20            A.   Yes.                                 10:43:29
21            Q.   And loan officers can also receive   10:43:29
22   an annual productivity bonus, correct?              10:43:34
23            A.   Yes.                                 10:43:37
24            Q.   Can you describe that?               10:43:37
25            A.   The productivity bonus is based on   10:43:39
```

MARK   WILSON 10/12/2011

Page 75

```
1    meeting certain thresholds that we set within      10:43:42

2    the plan each year.  If they meet the              10:43:44

3    threshold, then they are eligible for an annual    10:43:47

4    payout.                                            10:43:49

5            Q.   Threshold of what?                     10:43:49

6            A.   The threshold, depending on the        10:43:50

7    plan year, would vary from year to year.           10:43:53

8            Q.   But what is the -- what literally      10:43:57

9    is the threshold?  Not the number, but is it --    10:43:59

10   what does the threshold represent?                 10:44:02

11           A.    The threshold represents either a     10:44:04

12   productivity level in units or productivity        10:44:07

13   level in volume.                                   10:44:09

14           Q.   So number of units sold or the        10:44:10

15   total value of those units sold?                   10:44:13

16           A.   Yes.                                   10:44:16

17           Q.   Does Fifth Third, when it is          10:44:16

18   looking to hire loan officers, look at their       10:44:27

19   sales experience?                                  10:44:30

20           A.   Yes.                                   10:44:31

21           Q.   So that's one of the criteria that    10:44:32

22   they would use in determining whether to hire a    10:44:35

23   loan officer?                                       10:44:39

24           A.   Yes.                                   10:44:40

25           Q.   And loan officers have always had,    10:44:41
```

MARK  WILSON 10/12/2011

Page 76

```
 1    since you have been there, October 2005, let's        10:44:46

 2    put a time frame on it, October 2005 to               10:44:50

 3    December 31, 2010, have always had goals that         10:44:53

 4    they have to meet on a month by month basis,          10:45:01

 5    correct?                                              10:45:05

 6         A.   Yes.                                        10:45:05

 7         Q.   Okay.  Can you describe what those          10:45:05

 8    goals are?                                            10:45:07

 9         A.   The goals would be a minimum               10:45:08

10    expectation of units closed per month.               10:45:11

11         Q.   Is there a volume, as well, or is          10:45:14

12    it only units?                                       10:45:16

13         A.   We have tended to focus on units.          10:45:16

14         Q.   And if they fail to meet those             10:45:20

15    goals, what happens?                                 10:45:22

16         A.   Really, we look at all the factors         10:45:24

17    in terms of why they didn't meet the set             10:45:31

18    production level, but the manager would be           10:45:34

19    responsible for counseling that employee on how      10:45:37

20    to improve their sales performance.                  10:45:39

21         Q.   So there's -- are there sort of            10:45:41

22    like steps of you didn't meet it this month, we      10:45:44

23    are going to have a talk, two months in a row        10:45:50

24    we have to have a written warning, something         10:45:52

25    like that?                                           10:45:54
```

MARK  WILSON 10/12/2011

Page 77

```
 1          A.    Yes.                                10:45:54

 2          Q.    Can you describe what that is?      10:45:54

 3          A.    Basically what we do is we look at  10:45:56

 4    the performance period.  So if performance      10:46:05

 5    comes in under standards for a month, it's a    10:46:05

 6    conversation.  If we see under-performance      10:46:06

 7    below the standard in a second month, it would  10:46:09

 8    typically go to a written warning of some sort. 10:46:12

 9    And then from that perspective, if we don't see 10:46:15

10    improved performance within a certain time      10:46:19

11    period, sometimes it can be immediate sustained 10:46:21

12    improvement that we would be looking for, that  10:46:27

13    would potentially be when we would move to      10:46:29

14    termination.                                    10:46:31

15          Q.    Are you aware of any loan officers  10:46:31

16    that have been promoted to ASM because of their 10:46:41

17    sales?                                          10:46:49

18          A.    Yes.                                10:46:49

19          Q.    What's the benefit of moving from   10:46:49

20    a loan officer position to an ASM 1 position,   10:46:55

21    for example?                                    10:46:59

22          A.    I think the benefit would be from   10:47:00

23    a development standpoint.  If a person wants to  10:47:01

24    progress into management, that's a great path   10:47:03

25    to go.  In addition to the personal component   10:47:06
```

MARK   WILSON 10/12/2011

Page 78

```
 1    of production, they would also have            10:47:09

 2    compensation elements related to the team's    10:47:12

 3    production, as well.                           10:47:15

 4         Q.   And there's also a threshold where   10:47:15

 5    loan officers can, if they have enough sales or 10:47:20

 6    volume or units, can be assigned a sales       10:47:23

 7    assistant, correct?                            10:47:27

 8         A.   Yes.                                  10:47:28

 9         Q.   What is the -- what's the role of     10:47:29

10    the sales assistant?                           10:47:32

11         A.   A sales assistant really would be     10:47:34

12    somebody that can help the loan officer process 10:47:37

13    the loans.  In addition to processing loans,   10:47:39

14    they can also help with marketing activities to 10:47:42

15    build that loan officer's business.            10:47:45

16         Q.   And Fifth Third also ranks and        10:47:46

17    compares the loan officers based on their      10:47:53

18    sales, correct?                                 10:47:55

19         A.   Yes.                                  10:47:55

20         Q.   And they do that within the           10:47:56

21    affiliate, regionally, and then nationally,    10:47:59

22    correct?                                        10:48:01

23         A.   Yes.                                  10:48:01

24         Q.   And if loan officers are, at least   10:48:02

25    during -- prior to at least October 2005 to,   10:48:06
```

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | let's say, December 2010, was there -- were | 10:48:09 |
| 2 | there awards or prizes for being in a top | 10:48:14 |
| 3 | percentage or a top number of loan officers? | 10:48:21 |
| 4 | A.   Yes. | 10:48:21 |
| 5 | Q.   Can you describe that? | 10:48:21 |
| 6 | A.   One of the things we have is a | 10:48:22 |
| 7 | President's Circle, which is an annual rewards | 10:48:24 |
| 8 | trip or annual bonus based on being in those | 10:48:27 |
| 9 | top percentages. | 10:48:30 |
| 10 | Q.   What are the percentages? | 10:48:31 |
| 11 | A.   It depends.  It varies from role | 10:48:33 |
| 12 | to role. | 10:48:35 |
| 13 | Q.   By, I'm sorry? | 10:48:36 |
| 14 | A.   It varies from role to role. | 10:48:37 |
| 15 | Q.   Okay.  So what would be the | 10:48:39 |
| 16 | various roles? | 10:48:40 |
| 17 | A.   Like for an MLO, it might be the | 10:48:41 |
| 18 | top ten percent of our MLO's and based on | 10:48:43 |
| 19 | production volume.  We may have another | 10:48:47 |
| 20 | category that would be top five percent based | 10:48:50 |
| 21 | on actual number of units produced. | 10:48:53 |
| 22 | Q.   When you say role, though, are you | 10:48:56 |
| 23 | referring to an emerging markets versus an | 10:48:59 |
| 24 | outside or an inside? | 10:49:02 |
| 25 | A.   Typically we have categories for | 10:49:03 |

MARK   WILSON 10/12/2011

Page 80

| | | |
|---|---|---|
| 1 | loan officer, manager, affiliate mortgage | 10:49:06 |
| 2 | manager. | 10:49:09 |
| 3 | Q.   I see.  Those rankings are | 10:49:10 |
| 4 | published in an employee newsletter, correct? | 10:49:21 |
| 5 | A.   No. | 10:49:24 |
| 6 | Q.   No?  Are any awards published in | 10:49:25 |
| 7 | the employee newsletter? | 10:49:29 |
| 8 | A.   We don't have an employee | 10:49:32 |
| 9 | newsletter. | 10:49:34 |
| 10 | Q.   Okay.  I have seen reference to | 10:49:34 |
| 11 | Loan Street News.  Are you familiar with that? | 10:49:36 |
| 12 | A.   Loan Street Journal. | 10:49:39 |
| 13 | Q.   Loan Street Journal.  What is the | 10:49:40 |
| 14 | Loan Street Journal? | 10:49:42 |
| 15 | A.   Loan Street Journal was a | 10:49:42 |
| 16 | publication that we had that we no longer | 10:49:44 |
| 17 | publish, but it was something that we published | 10:49:48 |
| 18 | weekly with just general information. | 10:49:50 |
| 19 | Q.   Did it have information about the | 10:49:52 |
| 20 | rankings or of awards given to loan officers? | 10:49:56 |
| 21 | A.   It would have once the awards were | 10:50:00 |
| 22 | handed out.  It would also have links to where | 10:50:03 |
| 23 | the rankings were kept. | 10:50:06 |
| 24 | Q.   Are you familiar with XINNIX sales | 10:50:10 |
| 25 | training? | 10:50:22 |

MARK   WILSON 10/12/2011

Page 81

| | | |
|---|---|---|
| 1 | A.   Yes. | 10:50:22 |
| 2 | Q.   What is that? | 10:50:22 |
| 3 | A.   It's sales productivity training | 10:50:22 |
| 4 | that we have partnered with an external firm. | 10:50:22 |
| 5 | Q.   What does it entail?  What does | 10:50:23 |
| 6 | the training entail? | 10:50:25 |
| 7 | A.   XINNIX is a firm that specializes | 10:50:27 |
| 8 | in the mortgage sales process.  So we have left | 10:50:30 |
| 9 | it up to each affiliate to determine which of | 10:50:33 |
| 10 | their participants would go through the | 10:50:35 |
| 11 | training.  We have gone through a couple | 10:50:37 |
| 12 | different iterations in terms of having all | 10:50:41 |
| 13 | employees going through the training and then | 10:50:44 |
| 14 | having select employees go through the | 10:50:45 |
| 15 | training. | 10:50:49 |
| 16 | Q.   And how long has Fifth Third been | 10:50:49 |
| 17 | utilizing XINNIX sales training? | 10:50:53 |
| 18 | A.   I believe since 2009. | 10:50:55 |
| 19 | Q.   And are there documents associated | 10:50:59 |
| 20 | with the sales training? | 10:51:05 |
| 21 | A.   Most of the training is web-based, | 10:51:06 |
| 22 | but there are some homework pieces that are | 10:51:09 |
| 23 | expected for the loan officers to complete in | 10:51:11 |
| 24 | between the trainings. | 10:51:14 |
| 25 | Q.   When a loan officer is hired, is | 10:51:15 |

MARK   WILSON 10/12/2011

Page 84

```
 1            A.   A lot of times if an employee          10:53:27

 2    terminates, it's -- we have records retention       10:53:28

 3    guidelines, so the manager should check with        10:53:31

 4    the records retention guidelines on what they       10:53:34

 5    can basically get rid of and what they need to      10:53:36

 6    keep.                                               10:53:39

 7            Q.   And you are not aware if that's         10:53:40

 8    part of their file?                                 10:53:43

 9            A.   No.                                     10:53:44

10            Q.   Looking back at your declaration,      10:53:45

11    Exhibit 3, paragraph seven discusses your           10:54:19

12    initial review of the Fair Labor Standards Act      10:54:37

13    and regulations related to the administrative       10:54:41

14    exemption and loan officers.  Do you agree with     10:54:45

15    that?                                               10:54:48

16            A.   Yes.                                    10:54:48

17            Q.   You joined the company on              10:54:49

18    Halloween 2005.  Were you aware that you would      10:54:57

19    be immediately looking into these issues --         10:55:02

20            A.   No.                                     10:55:04

21            Q.   -- at the time?  No?                   10:55:04

22            A.   No.                                     10:55:05

23            Q.   Do you recall how soon after you       10:55:06

24    started looking at the federal regulations?         10:55:08

25            A.   I'd say it was in probably one or      10:55:12
```

MARK   WILSON 10/12/2011

Page 85

| | | |
|---|---|---|
| 1 | two months. | 10:55:16 |
| 2 | Q.   Were you instructed by someone to | 10:55:18 |
| 3 | look at them? | 10:55:24 |
| 4 | A.   No. | 10:55:24 |
| 5 | Q.   Did you keep any notes from your | 10:55:24 |
| 6 | review of them? | 10:55:24 |
| 7 | A.   No. | 10:55:27 |
| 8 | Q.   Do you have any e-mail | 10:55:27 |
| 9 | correspondence related to your review of those | 10:55:29 |
| 10 | regulations during that time frame? | 10:55:31 |
| 11 | A.   During the time frame related to | 10:55:33 |
| 12 | item number seven? | 10:55:35 |
| 13 | Q.   Correct. | 10:55:36 |
| 14 | A.   No. | 10:55:37 |
| 15 | Q.   No?  Did you draft any memos for | 10:55:37 |
| 16 | other human resources employees or other | 10:55:44 |
| 17 | executives related to your review? | 10:55:49 |
| 18 | A.   No. | 10:55:51 |
| 19 | Q.   You mentioned that -- you | 10:55:51 |
| 20 | reference the -- excuse me.  You referenced | 10:55:59 |
| 21 | that you reviewed the CFR 541.203(b).  Do you | 10:56:02 |
| 22 | recall if you reviewed the preamble to the new | 10:56:08 |
| 23 | regulations, the 2004 regulations? | 10:56:14 |
| 24 | A.   No, I don't recall. | 10:56:18 |
| 25 | Q.   When you began this review, did | 10:56:19 |

MARK  WILSON 10/12/2011

Page 86

| | |
|---|---|
| 1    you review any case law related to the | 10:56:25 |
| 2    classification of loan officers? | 10:56:31 |
| 3          A.    No. | 10:56:32 |
| 4          Q.    So at that point, you weren't | 10:56:32 |
| 5    aware of the Casas versus Conseco case? | 10:56:35 |
| 6          A.    No. | 10:56:39 |
| 7          Q.    Are you aware of that case now? | 10:56:40 |
| 8          A.    No. | 10:56:41 |
| 9          Q.    And when you read the 541.203(b) | 10:56:56 |
| 10   regulation, did you understand that that was an | 10:57:02 |
| 11   example provided by the Department of Labor? | 10:57:05 |
| 12         A.    Yes. | 10:57:07 |
| 13         Q.    Did you also understand that it | 10:57:07 |
| 14   was the Department of Labor's position that | 10:57:13 |
| 15   loan officers who have the primary duty of | 10:57:15 |
| 16   making sales were -- should be classified as | 10:57:17 |
| 17   non-exempt? | 10:57:20 |
| 18         A.    Repeat the question again. | 10:57:21 |
| 19         Q.    Sure.  When you reviewed, and I'm | 10:57:22 |
| 20   talking about this initial review that you did, | 10:57:25 |
| 21   when you reviewed 29 CFR 541.203(b), did you | 10:57:29 |
| 22   understand it was the Department of Labor's | 10:57:35 |
| 23   position that loan officers who have the | 10:57:36 |
| 24   primary duty of making sales should be | 10:57:39 |
| 25   classified as non-exempt? | 10:57:41 |

MARK   WILSON 10/12/2011

Page 87

| | | |
|---|---|---|
| 1 | A.   No. | 10:57:43 |
| 2 | Q.   You didn't have that | 10:57:43 |
| 3 | understanding.  Had you -- prior to working for | 10:57:47 |
| 4 | Fifth Third, had you ever worked for a bank? | 10:58:08 |
| 5 | A.   No. | 10:58:10 |
| 6 | Q.   How did you -- you said you | 10:58:10 |
| 7 | shadowed a loan officer for half of a day.  How | 10:58:14 |
| 8 | else did you familiarize yourself with the job | 10:58:17 |
| 9 | duties of a loan officer when you were | 10:58:21 |
| 10 | conducting this initial review? | 10:58:25 |
| 11 | A.   Really it was working closely with | 10:58:26 |
| 12 | several of the line of business partners, so, | 10:58:29 |
| 13 | you know, attending meetings where we would | 10:58:30 |
| 14 | talk about strategy, also specific tactics, | 10:58:32 |
| 15 | everything in terms of putting together the | 10:58:36 |
| 16 | overall financial plan for the mortgage | 10:58:38 |
| 17 | company, and in terms of working with the | 10:58:41 |
| 18 | affiliates.  So really it's just building those | 10:58:43 |
| 19 | relationships with the partners that I would | 10:58:45 |
| 20 | support as part of the mortgage company. | 10:58:47 |
| 21 | Q.   Do you recall who any of those | 10:58:50 |
| 22 | people were? | 10:58:52 |
| 23 | A.   Yes. | 10:58:52 |
| 24 | Q.   Could you name them? | 10:58:54 |
| 25 | A.   There were some on the | 10:58:55 |

MARK WILSON 10/12/2011

Page 88

```
1    organizational chart that we referenced          10:58:58
2    earlier, many of those people.                   10:59:01
3         Q.   Why don't we take a look at that,       10:59:03
4    just so we can get -- so you are looking at       10:59:05
5    Exhibit 2, correct?                               10:59:15
6         A.   Yes.                                     10:59:17
7         Q.   Who would you have consulted with       10:59:18
8    to learn about the job duties of loan officers    10:59:21
9    in this October -- early time frame in your       10:59:23
10   employment?                                       10:59:27
11        A.   One would be Geoff Hill, Steve          10:59:27
12   Johnson.  At the time, some of these people       10:59:38
13   were not there.  Another one that would -- I      10:59:40
14   would probably have would be Joe Treinen.         10:59:45
15        Q.   Could you spell his last name?          10:59:47
16        A.   I believe it's T R E I N E N.           10:59:48
17        Q.   Is he still with the company?           10:59:54
18        A.   No.                                      10:59:55
19        Q.   What was his position in October        10:59:56
20   of 2005?                                          10:59:59
21        A.   He had responsibility for the           11:00:00
22   retail sales programs and products.  So all the   11:00:02
23   affiliate MLO's.                                  11:00:07
24        Q.   Anyone else that you can think of?      11:00:11
25        A.   No.                                      11:00:16
```

MARK   WILSON 10/12/2011

Page 89

| | | |
|---|---|---|
| 1 | Q.   When you were conducting this | 11:00:16 |
| 2 | initial review, did you review any of the prior | 11:00:29 |
| 3 | Department of Labor opinion letters related to | 11:00:34 |
| 4 | loan officers? | 11:00:37 |
| 5 | A.   No. | 11:00:37 |
| 6 | Q.   Were you aware of litigation that | 11:00:38 |
| 7 | was occurring related to the exempt status of | 11:00:49 |
| 8 | loan officers? | 11:00:53 |
| 9 | A.   No. | 11:00:53 |
| 10 | Q.   Now, paragraph eight, it says | 11:00:54 |
| 11 | during mid 2006, the business, along with the | 11:01:07 |
| 12 | assistance of the legal department, reviewed | 11:01:10 |
| 13 | the MLO positions.  I want to clarify that that | 11:01:12 |
| 14 | date there, during mid 2006, is correct. | 11:01:18 |
| 15 | A.   Yes. | 11:01:21 |
| 16 | Q.   Is that accurate?  Okay.  When you | 11:01:22 |
| 17 | say the business in this paragraph, what are | 11:01:26 |
| 18 | you referring to? | 11:01:31 |
| 19 | A.   The line of business. | 11:01:31 |
| 20 | Q.   And who else other than you would | 11:01:33 |
| 21 | have been reviewing the MLO positions? | 11:01:38 |
| 22 | A.   Our compensation department and | 11:01:42 |
| 23 | the legal department, as mentioned, and | 11:01:46 |
| 24 | representatives from the line of business. | 11:01:48 |
| 25 | Q.   Okay.  So compensation, legal, and | 11:01:50 |

MARK   WILSON 10/12/2011

| | |
|---|---|
| 1 then the representatives from line of business. | 11:01:57 |
| 2 Who from the compensation department? | 11:01:59 |
| 3         A.   Lauren Olson. | 11:02:01 |
| 4         Q.   Do you know if that's O L S O N or | 11:02:07 |
| 5 E N? | 11:02:10 |
| 6         A.   O N. | 11:02:10 |
| 7         Q.   Anyone else from the compensation | 11:02:11 |
| 8 department? | 11:02:15 |
| 9         A.   Sean Stapleton. | 11:02:15 |
| 10        Q.   Anybody else? | 11:02:17 |
| 11        A.   No. | 11:02:21 |
| 12        Q.   What about from legal? | 11:02:22 |
| 13        A.   At this time, it probably would | 11:02:24 |
| 14 have been Keith Rummer. | 11:02:27 |
| 15        Q.   I'm sorry, Keith -- | 11:02:29 |
| 16        A.   Rummer. | 11:02:30 |
| 17        Q.   R U M M E R? | 11:02:32 |
| 18        A.   Yes. | 11:02:33 |
| 19        Q.   Anyone else? | 11:02:34 |
| 20        A.   No. | 11:02:35 |
| 21        Q.   And then the other people from the | 11:02:37 |
| 22 line of business, who are you referring to | 11:02:45 |
| 23 there? | 11:02:46 |
| 24        A.   It would have been Joe Treinen, as | 11:02:46 |
| 25 I mentioned earlier. | 11:02:49 |

MARK  WILSON 10/12/2011

Page 91

1        Q.    Anyone else?                                  11:02:50

2        A.    Probably the mortgage president at            11:02:54

3   the time, Mr. Rick Greenlee.                             11:03:02

4        Q.    Anyone else that you can think of?            11:03:04

5        A.    No.                                           11:03:09

6        Q.    And it says reviewed the mortgage             11:03:09

7   loan -- the MLO positions.  Which positions?             11:03:14

8   It's plural.  I'm wondering which positions you          11:03:24

9   are referring to there.                                  11:03:26

10        A.    It would be our retail MLO                   11:03:26

11   positions.                                              11:03:29

12        Q.    And within that, what are you                11:03:30

13   referring to?                                           11:03:32

14        A.    The specific job codes that we had           11:03:32

15   at the time for those that were the affiliate           11:03:36

16   based positions.                                        11:03:40

17        Q.    Do you recall what those were, not           11:03:41

18   the specific job codes, but the title that went         11:03:46

19   along with the job code?                                11:03:49

20        A.    A lot of them probably are our               11:03:50

21   emerging markets MLO.  I can't recall some of           11:03:57

22   the other titles that we would have had for it.         11:04:04

23   I'm not sure if the outside MLO was in place at         11:04:07

24   that time, so --                                        11:04:09

25        Q.    How did you review the position?             11:04:10

MARK   WILSON 10/12/2011

Page 92

```
 1    What did you do with this group to review the          11:04:20
 2    position?                                               11:04:23
 3            A.   Well, I think part of it was, you          11:04:24
 4    know, based on the new provisions related to            11:04:27
 5    the FLSA.  One of the things our company does           11:04:31
 6    on a regular basis is periodically audit groups         11:04:34
 7    of positions just to make sure we are in                11:04:39
 8    compliance with the FLSA.                               11:04:40
 9            Q.   So what went into this particular          11:04:43
10    audit?                                                  11:04:45
11            A.   This particular audit just looked          11:04:46
12    at the duties and responsibilities of the role         11:04:48
13    and just making sure that those duties and             11:04:51
14    responsibilities, you know, one, still applied         11:04:53
15    and, two, assessing where they would fall as it        11:04:56
16    relates to the FLSA guidelines.                         11:05:00
17            Q.   How did you determine -- how did           11:05:03
18    you assess the job duties and responsibilities         11:05:08
19    of the MLO's?                                           11:05:10
20            A.   I think one of the things was as          11:05:13
21    part of the team that I mentioned, Joe Treinen,        11:05:15
22    for example, a former MLO, had worked his way          11:05:18
23    up to manager and worked his way up into the           11:05:21
24    bank core role.  So within his day-to-day              11:05:23
25    responsibilities, as well as his work                   11:05:25
```

MARK   WILSON 10/12/2011

Page 93

```
 1    experience, he is very familiar with the duties    11:05:26

 2    and responsibilities of an MLO, so he was a        11:05:28

 3    voice of the business through those                11:05:31

 4    conversations to validate these are the duties     11:05:56

 5    and responsibilities for the role.                 11:05:56

 6            Q.   Was there any survey done of the      11:05:56

 7    MLO's?                                             11:05:56

 8            A.   No.                                   11:05:56

 9            Q.   Any interviews done with MLO's?       11:05:56

10            A.   No.                                   11:05:56

11            Q.   Were there any memos created          11:05:56

12    memorializing the audit?                           11:05:56

13            A.   No.                                   11:05:58

14            Q.   Any presentations, PowerPoints, or    11:05:58

15    something to that effect, handouts at a meeting    11:06:02

16    that you recall?                                   11:06:05

17            A.   Probably some handouts.               11:06:06

18            Q.   Do you still have those documents?    11:06:09

19            A.   No.                                   11:06:11

20            Q.   Was there e-mail correspondence       11:06:11

21    relating to these meetings and the discussions     11:06:15

22    you were having?                                   11:06:17

23            A.   I think correspondence was limited    11:06:18

24    to meeting times and appointments.                 11:06:20

25            Q.   Do you recall when the audit was      11:06:22
```

MARK   WILSON 10/12/2011

Page 94

```
 1    complete?                                          11:06:31

 2            A.    Not specifically.                    11:06:32

 3            Q.    Generally?                            11:06:33

 4            A.    I'd say in the mid to late 2006      11:06:37

 5    time period.                                       11:06:39

 6            Q.    There's also -- in the second        11:06:40

 7    sentence of that paragraph, it says the            11:07:00

 8    business worked with in-house legal counsel and    11:07:03

 9    senior management to evaluate the position,        11:07:05

10    parentheses, S.  Is that a differentiation that    11:07:07

11    you were making whether it was multiple            11:07:15

12    positions or one position?                         11:07:16

13            A.    Multiple positions.                  11:07:18

14            Q.    It says Fifth Third's needs -- it    11:07:20

15    continues and says the new FLSA regulations and    11:07:27

16    Fifth Third's needs with respect to financial      11:07:27

17    services employees.  What were Fifth Third's       11:07:30

18    needs at the time?  What are you referring to      11:07:32

19    as Fifth Third's needs?                            11:07:35

20            A.    The expectations around duties and   11:07:36

21    responsibilities for our MLO's.                    11:07:40

22            Q.    And do you recall what those         11:07:41

23    expectations were?                                 11:07:44

24            A.    Very similar to what we have         11:07:45

25    discussed previously in terms of production.       11:07:48
```

MARK   WILSON 10/12/2011

Page 95

| | |
|---|---|
| 1        Q.   So was it sales, actually numbers, | 11:07:50 |
| 2    that you are talking about? | 11:07:55 |
| 3        A.   It was numbers, but also some of | 11:07:56 |
| 4    the cross-sell pieces, as well. | 11:08:00 |
| 5        Q.   What would the -- what would the | 11:08:03 |
| 6    numbers have to do with whether or not someone | 11:08:20 |
| 7    was administratively exempt as far as -- we are | 11:08:22 |
| 8    talking about volume and units.  What does that | 11:08:26 |
| 9    have to do with the administrative exemption | 11:08:29 |
| 10   analysis that you were undertaking or going | 11:08:32 |
| 11   under? | 11:08:34 |
| 12        MR. HALL:  Objection to the form | 11:08:35 |
| 13   of the question. | 11:08:36 |
| 14        THE WITNESS:  So let me make sure | 11:08:37 |
| 15   I understand how you are looking at Fifth | 11:08:39 |
| 16   Third's needs.  How are you defining that? | 11:08:42 |
| 17   BY MR. SELANDER: | 11:08:44 |
| 18        Q.   Well, I asked you what Fifth | 11:08:44 |
| 19   Third's needs were, and you said that it | 11:08:46 |
| 20   related to the sales figures, essentially units | 11:08:49 |
| 21   and volume. | 11:08:56 |
| 22        A.   I think I also said duties and | 11:08:58 |
| 23   responsibilities of an MLO, responsibility to | 11:09:00 |
| 24   the company. | 11:09:03 |
| 25        Q.   And I guess my question is what is | 11:09:03 |

Merrill Corporation - Minnesota
612-338-1181                                   www.merrillcorp.com/law

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | the -- what do the units and the volume have to | 11:09:06 |
| 2 | do with the administrative exemption analysis | 11:09:08 |
| 3 | that you undertook? | 11:09:12 |
| 4 | A.   I think one of the things that | 11:09:12 |
| 5 | they get to would be the discretion.  So for an | 11:09:14 |
| 6 | MLO to be productive in terms of the | 11:09:18 |
| 7 | productivity, it gets to how they are having | 11:09:19 |
| 8 | conversations with a customer.  If they are not | 11:09:23 |
| 9 | productive in those conversations, the customer | 11:09:26 |
| 10 | can walk and go down to another bank down the | 11:09:29 |
| 11 | street.  So I would say productivity would be | 11:09:31 |
| 12 | an indication of the LO's competency around the | 11:09:34 |
| 13 | duties and responsibilities. | 11:09:38 |
| 14 | Q.   Was there any discussion during | 11:09:40 |
| 15 | this mid 2006 audit of whether the loan | 11:09:53 |
| 16 | officers, the MLO's, had the primary duty of | 11:09:59 |
| 17 | making sales? | 11:10:02 |
| 18 | A.   Clarify your question when you say | 11:10:03 |
| 19 | making sales.  How are you defining that? | 11:10:05 |
| 20 | Q.   Well, the sales process that you | 11:10:08 |
| 21 | had described earlier. | 11:10:11 |
| 22 | MR. HALL:  Objection to the form | 11:10:14 |
| 23 | of the question. | 11:10:15 |
| 24 | THE WITNESS:  So repeat the | 11:10:16 |
| 25 | question again. | 11:10:17 |

MARK  WILSON 10/12/2011

Page 97

```
 1    BY MR. SELANDER:                                  11:10:18

 2         Q.   Sure.  Was there any discussion         11:10:18

 3    about whether or not loan officers had the        11:10:19

 4    primary duty of making sales?                     11:10:23

 5         A.   No.                                      11:10:26

 6         Q.   And at the end, it says that the        11:10:27

 7    determination was made or it was determined       11:10:42

 8    that the positions remained as administratively   11:10:46

 9    exempt under the revised FLSA regulations.  Was   11:10:49

10    that a collective decision, or was it your        11:10:53

11    decision or someone else's?  Can you describe     11:10:56

12    that?                                             11:10:59

13         A.   A collective decision.                  11:11:00

14         Q.   And there was no document               11:11:01

15    memorializing that decision?                      11:11:04

16         A.   As far as I know, I don't think         11:11:04

17    there was.                                        11:11:06

18         Q.   Looking at paragraph nine, it           11:11:07

19    describes your learning of the Mortgage           11:11:18

20    Banker's Association request to the Department    11:11:23

21    of Labor for an opinion letter; is that           11:11:27

22    accurate?                                         11:11:32

23         A.   Yes.                                    11:11:32

24         Q.   How did you learn about that            11:11:32

25    Mortgage Banker request?                          11:11:34
```

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | looked at the piece in item number eight. | 11:12:41 |
| 2 | Q.   So following that same group who | 11:12:44 |
| 3 | also had knowledge of the Mortgage Banker's | 11:12:50 |
| 4 | Association letter? | 11:12:52 |
| 5 | A.   Yes. | 11:12:53 |
| 6 | Q.   Was that something that was | 11:12:53 |
| 7 | discussed during your audit, as well? | 11:12:55 |
| 8 | A.   I don't recall if it was. | 11:12:58 |
| 9 | Q.   Looking at paragraph ten, which | 11:13:00 |
| 10 | continues on to page three, you received a copy | 11:13:23 |
| 11 | of the opinion letter after it was issued on | 11:13:31 |
| 12 | September 8th.  Do you remember how you | 11:13:34 |
| 13 | obtained a copy of it? | 11:13:35 |
| 14 | A.   I think I received it from our | 11:13:36 |
| 15 | compensation partners. | 11:13:38 |
| 16 | Q.   And it says, continuing on to the | 11:13:40 |
| 17 | second page, page three, excuse me, at the top, | 11:13:48 |
| 18 | following my receipt of the September 2006 | 11:13:55 |
| 19 | opinion letter, we also contacted outside | 11:13:58 |
| 20 | counsel and others in the industry to determine | 11:13:59 |
| 21 | what others in the financial services -- what | 11:14:03 |
| 22 | others in financial services were doing with | 11:14:06 |
| 23 | respect to similar positions.  What outside | 11:14:08 |
| 24 | counsel did you contact? | 11:14:12 |
| 25 | A.   I don't remember the name of the | 11:14:13 |

MARK  WILSON 10/12/2011

Page 102

| | | |
|---|---|---|
| 1 | Q.   Did you understand that the | 11:16:04 |
| 2 | opinion letter issued on September 8, 2006, by | 11:16:24 |
| 3 | the DOL was based on an underlying assumption | 11:16:29 |
| 4 | that less than 50 percent of the loan officer | 11:16:33 |
| 5 | job duties were related to customer | 11:16:37 |
| 6 | persuasive -- customer specific persuasive | 11:16:42 |
| 7 | sales activity? | 11:16:46 |
| 8 | A.   Yes. | 11:16:46 |
| 9 | Q.   How did you determine that Fifth | 11:16:47 |
| 10 | Third's loan officers spent less than | 11:16:53 |
| 11 | 50 percent on those activities? | 11:16:57 |
| 12 | A.   I go back to the time that I was | 11:16:58 |
| 13 | able to shadow an MLO, and that gave me good | 11:17:00 |
| 14 | exposure to what they would do on a typical | 11:17:03 |
| 15 | day, but also members of our team.  I | 11:17:06 |
| 16 | referenced Joe Treinen previously.  We relied | 11:17:09 |
| 17 | on him as the voice of our customer, so to | 11:17:12 |
| 18 | speak, to be kind of the voice of the business | 11:17:16 |
| 19 | and really bring the nature of the duties and | 11:17:18 |
| 20 | responsibilities of the LO to the table. | 11:17:20 |
| 21 | Q.   After reading the September 8, | 11:17:32 |
| 22 | 2006, opinion letter, did you understand that | 11:17:52 |
| 23 | it was the Department of Labor's position that | 11:17:53 |
| 24 | a loan officer with the primary duty of sales | 11:17:57 |
| 25 | should be classified as non-exempt? | 11:18:00 |

MARK   WILSON 10/12/2011

| | |
|---|---|
| 1      A.   Yes. | 11:18:01 |
| 2      Q.   And, again, during this time | 11:18:01 |
| 3  period, there was no -- no effort to speak to | 11:18:19 |
| 4  or obtain information from the loan officers | 11:18:25 |
| 5  that Fifth Third employed about their job | 11:18:27 |
| 6  duties and the time they spent on particular | 11:18:30 |
| 7  activities? | 11:18:33 |
| 8      MR. HALL:  Objection to the form | 11:18:39 |
| 9  of the question. | 11:18:42 |
| 10      THE WITNESS:  Yes, that's correct. | 11:18:42 |
| 11      MR. SELANDER:  Let's mark that. | 11:18:59 |
| 12      (Thereupon, Plaintiffs' Exhibit 6, | |
| 13  memorandum to Stephanie Bauer Daniel from | |
| 14  Robert C. Varnell dated November 8, 2006, was | |
| 15  marked for purposes of identification.) | |
| 16  BY MR. SELANDER: | |
| 17      Q.   The court reporter has handed you | 11:19:35 |
| 18  Exhibit 6, which is Defendant's Bates labeled | 11:19:37 |
| 19  262 through 268.  Do you have that? | 11:19:46 |
| 20      A.   Yes, I do. | 11:19:50 |
| 21      Q.   And do you recognize this | 11:19:51 |
| 22  document? | 11:19:52 |
| 23      A.   Yes, I do. | 11:19:53 |
| 24      Q.   And is this the memo that you | 11:19:54 |
| 25  obtained from Mr. Varnell as the outside | 11:19:58 |

MARK  WILSON 10/12/2011

Page 104

```
 1   counsel?                                          11:20:02

 2          A.   Yes.                                  11:20:03

 3          Q.   On the last page, there's a carbon    11:20:04

 4   copy to Robert P. Davis and Tamara S. Killion.    11:20:29

 5   Do you know who Tamara S. Killion is?             11:20:35

 6          A.   No.                                   11:20:37

 7          Q.   Do you recall ever speaking with      11:20:38

 8   her?                                              11:20:41

 9          A.   No.                                   11:20:41

10          Q.   Do you recall ever speaking with      11:20:42

11   Robert Davis?                                     11:20:43

12          A.   No.                                   11:20:44

13          Q.   Did you ever speak with Rob           11:20:45

14   Varnell?                                          11:20:48

15          A.   No.                                   11:20:48

16          Q.   In footnote two on page one,          11:20:49

17   Mr. Varnell says that, quote, our current         11:21:06

18   understanding of the duties performed by Fifth    11:21:08

19   Third Bank's mortgage loan officers is based      11:21:11

20   principally on a review of certain job            11:21:13

21   descriptions and other materials provided to      11:21:15

22   us.  Do you know what job descriptions and        11:21:17

23   other materials were provided to Mr. Varnell?     11:21:21

24          A.   No.                                   11:21:24

25          Q.   Do you know who would know that?      11:21:25
```

MARK   WILSON 10/12/2011

Page 105

| | | |
|---|---|---|
| 1 | A.    No. | 11:21:27 |
| 2 | Q.    Do you think Stephanie Bauer | 11:21:27 |
| 3 | Daniel would know? | 11:21:31 |
| 4 | A.    Potentially. | 11:21:31 |
| 5 | Q.    Did the team -- to your knowledge, | 11:21:32 |
| 6 | did the team that you were working with and | 11:21:42 |
| 7 | that you have described earlier have | 11:21:46 |
| 8 | conversations with Mr. Varnell or Mr. Davis? | 11:21:47 |
| 9 | A.    No. | 11:21:55 |
| 10 | Q.    Do you not know or they did not | 11:21:56 |
| 11 | have conversations? | 11:22:00 |
| 12 | A.    Our team did not have a meeting or | 11:22:01 |
| 13 | conference call with the outside counsel.  The | 11:22:04 |
| 14 | first time I saw this letter was when Stephanie | 11:22:07 |
| 15 | had distributed it to us to review. | 11:22:10 |
| 16 | Q.    Were you aware that she had | 11:22:13 |
| 17 | contacted outside counsel? | 11:22:14 |
| 18 | A.    Yes. | 11:22:17 |
| 19 | Q.    Do you know if Mr. Varnell ever | 11:22:17 |
| 20 | spoke to any Fifth Third Bank loan officers? | 11:22:51 |
| 21 | A.    I don't know. | 11:22:51 |
| 22 | Q.    The letter also references the | 11:22:51 |
| 23 | inside versus outside loan officers. | 11:22:51 |
| 24 | A.    Yes. | 11:22:55 |
| 25 | Q.    Which loan officers is he | 11:22:55 |

MARK   WILSON 10/12/2011

Page 120

| | |
|---|---|
| 1       Q.   Anything else that impacted the | 11:42:42 |
| 2  mortgage loan officer position? | 11:42:45 |

MARK   WILSON 10/12/2011

Page 120

```
 1          Q.   Anything else that impacted the      11:42:42

 2   mortgage loan officer position?                   11:42:45

 3          A.   From a process step, I mean, those    11:42:47

 4   course associated process steps you would have    11:42:50

 5   to go through with the TILA.                       11:42:52

 6          Q.   What about the Dodd-Frank Act, how    11:42:58

 7   did that impact the mortgage loan officer         11:43:03

 8   position?                                          11:43:06

 9          A.   Probably the biggest impact was       11:43:06

10   around some of the compensation elements.  Also   11:43:08

11   Dodd-Frank had specific pieces preventing any     11:43:12

12   type of steering, so steering to certain          11:43:15

13   products.  We could not compensate our LO's       11:43:18

14   more for certain products.  We could not pay on   11:43:21

15   profitability of the loan.                         11:43:26

16          Q.   How was Fifth Third paying on         11:43:29

17   profitability of the loan?                         11:43:33

18          A.   We had qualifiers for the annual      11:43:34

19   bonus that had to meet a certain threshold in     11:43:38

20   terms of profitability.  Also our sales           11:43:41

21   managers had some profitability metrics, like     11:43:48

22   revenue, for example, that they were              11:43:48

23   compensated on.                                    11:43:49

24          Q.   So what would make a loan more        11:43:51

25   profitable or less profitable?                     11:43:52
```

MARK   WILSON 10/12/2011

Page 121

```
 1            A.    A variety of factors.  You know,      11:43:54

 2    one of the things that Dodd-Frank prevents          11:44:03

 3    would be taking an overage or an underage on a      11:44:03

 4    loan.  So from that standpoint, if we have          11:44:05

 5    charged a higher price, or if we have had to        11:44:08

 6    take a lower price, those would all impact          11:44:11

 7    profitability.                                       11:44:18

 8            Q.    Anything else that you can think      11:44:18

 9    of?                                                  11:44:18

10            A.    Cost originate, so what's your        11:44:18

11    sales infrastructure in terms of people that       11:44:19

12    you have in place.  That impacts profitability,    11:44:22

13    as well.                                             11:44:25

14            Q.    That didn't have anything to do       11:44:26

15    with Dodd-Frank, though, did it?                    11:44:28

16            A.    You couldn't pay on -- you know,      11:44:29

17    for example, we had some of our ASM plans that     11:44:31

18    paid on revenue.  We couldn't do that anymore      11:44:35

19    under Dodd-Frank.                                    11:44:37

20            Q.    Anything else in terms of             11:44:40

21    Dodd-Frank that impacted the MLO position?         11:44:44

22            A.    More focus on risk and managing       11:44:47

23    risk and making sure that the compensation         11:44:52

24    plans were not driving inappropriate behaviors     11:44:55

25    from a risk standpoint.                             11:44:59
```

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | Q.   What would -- can you give me an | 11:45:00 |
| 2 | example of steering?  How would that -- when | 11:45:03 |
| 3 | would that occur?  And I'm not suggesting that | 11:45:07 |
| 4 | it did.  I'm just -- I don't understand the | 11:45:09 |
| 5 | idea of steering. | 11:45:14 |
| 6 | MR. HALL:  Objection to the form | 11:45:15 |
| 7 | of the question. | 11:45:16 |
| 8 | THE WITNESS:  An example of | 11:45:16 |
| 9 | steering would be as an MLO meets with a | 11:45:17 |
| 10 | customer and whether intentionally or | 11:45:20 |
| 11 | unintentionally puts them into a product that | 11:45:24 |
| 12 | isn't the right fit for the customer.  So it | 11:45:29 |
| 13 | may be they did not disclose it properly, they | 11:45:30 |
| 14 | may be steering them to a product that provides | 11:45:35 |
| 15 | more compensation for the LO's pocketbook, but | 11:45:38 |
| 16 | may not be to the best service of the customer. | 11:45:42 |
| 17 | MR. HALL:  Tim, I'm sorry, | 11:46:06 |
| 18 | whenever you get -- | 11:46:07 |
| 19 | MR. SELANDER:  Let's just take a | 11:46:07 |
| 20 | break. | 11:46:09 |
| 21 | (Recess taken.) | 11:46:12 |
| 22 | MR. SELANDER:  Let's go back on | 12:00:10 |
| 23 | the record. | 12:00:12 |
| 24 | BY MR. SELANDER: | 12:00:13 |
| 25 | Q.   Would you agree that Fifth Third | 12:00:14 |

MARK   WILSON 10/12/2011

| | | |
|---|---|---|
| 1 | refers to its loan officers as the sales force? | 12:00:17 |
| 2 | A.   Yes. | 12:00:20 |
| 3 | Q.   And if you could look at the | 12:00:21 |
| 4 | Varnell memo.  What exhibit is that? | 12:00:30 |
| 5 | A.   6. | 12:00:35 |
| 6 | Q.   6.  Thank you.  I just want to | 12:00:35 |
| 7 | clarify that this was issued on November 8, | 12:00:42 |
| 8 | 2006, and after that, there was no further | 12:00:52 |
| 9 | review, audit, or discussion of changing the | 12:00:54 |
| 10 | exempt status of loan officers to non-exempt | 12:01:02 |
| 11 | until March 24, 2010? | 12:01:07 |
| 12 | A.   That's correct. | 12:01:09 |
| 13 | Q.   And there's no other documents | 12:01:10 |
| 14 | other than this relating to the opinion of | 12:01:11 |
| 15 | outside counsel? | 12:01:16 |
| 16 | A.   That's correct. | 12:01:17 |
| 17 | Q.   And if there were any other | 12:01:17 |
| 18 | documents, you would be aware, right? | 12:01:19 |
| 19 | MR. HALL:  Objection to the form | 12:01:22 |
| 20 | of the question. | 12:01:23 |
| 21 | THE WITNESS:  Yeah, I'm not sure | 12:01:23 |
| 22 | if I would be. | 12:01:24 |
| 23 | BY MR. SELANDER: | 12:01:25 |
| 24 | Q.   There was nothing else circulated | 12:01:26 |
| 25 | amongst the group that was looking at the | 12:01:28 |

MARK   WILSON 10/12/2011

Page 124

```
 1    exempt classification?                           12:01:30

 2            A.   That's correct.                     12:01:32

 3            Q.   And in your paragraph eight of      12:01:33

 4    your declaration, Exhibit 3, in the first        12:01:37

 5    sentence there you say during mid 2006, the      12:01:45

 6    business reviewed the MLO positions, and then    12:01:48

 7    this memo here from Rob Varnell, Exhibit 6, is   12:01:54

 8    dated November of 2006.  So is it fair to say    12:01:57

 9    that -- well, based on the date of this          12:02:02

10    document, the Varnell memo, Exhibit 6, does      12:02:05

11    that help you clarify when the review and the    12:02:09

12    audit actually began?                            12:02:14

13            MR. HALL:  Objection to the form         12:02:16

14    of the question, mischaracterizes the witness's  12:02:17

15    testimony.                                       12:02:20

16            THE WITNESS:  We started the             12:02:20

17    process before the actual letter had come out.   12:02:21

18    That's the audit that you see in item eight.     12:02:23

19    BY MR. SELANDER:                                 12:02:25

20            Q.   Okay.  So is that -- that's what I   12:02:26

21    mean, does it help you to clarify when it        12:02:28

22    began?  This is what the audit culminated in,    12:02:31

23    correct, is Exhibit 6, the Varnell memo?         12:02:34

24            MR. HALL:  Objection,                    12:02:37

25    mischaracterizes the witness's testimony.        12:02:38
```

| | |
|---|---|
| 1          THE WITNESS:  We have two work | 12:02:40 |
| 2    streams.  So we were looking at the MLO | 12:02:44 |
| 3    positions, then we also -- I mean, you kind of | 12:02:46 |
| 4    see a linkage here from a timeline perspective, | 12:02:50 |
| 5    but obviously when we received the DOL letter, | 12:02:53 |
| 6    you know, we took another look at it to make | 12:02:56 |
| 7    sure that we had properly classified our | 12:02:59 |
| 8    employees. | 12:03:00 |
| 9    BY MR. SELANDER: | 12:03:02 |
| 10         Q.   But the audit that you are | 12:03:02 |
| 11   describing in paragraph six, which is described | 12:03:04 |
| 12   as mid 2006, is occurring or began at some | 12:03:08 |
| 13   point before September 8, 2006? | 12:03:12 |
| 14        A.   Yes. | 12:03:15 |
| 15        Q.   Okay.  And as far as this audit | 12:03:15 |
| 16   process goes, again, I just want to be clear, | 12:03:32 |
| 17   you are not in possession of any documents or | 12:03:37 |
| 18   e-mails relating to that audit, correct? | 12:03:40 |
| 19        A.   That's correct. | 12:03:42 |
| 20        Q.   And correct me if I'm wrong, but I | 12:03:42 |
| 21   believe you earlier testified that the only | 12:03:48 |
| 22   thing there might have been that you recall is | 12:03:49 |
| 23   maybe a meeting agenda, a handout at a meeting | 12:03:53 |
| 24   or something? | 12:03:56 |
| 25        A.   Yes, that's correct. | 12:03:56 |

MARK  WILSON 10/12/2011

Page 126

```
 1          Q.    And in paragraph 11 of your          12:03:57
 2   declaration, the last sentence says we relied     12:04:04
 3   on the September 2006 opinion letter issued by    12:04:09
 4   the DOL and the advice of outside counsel in      12:04:12
 5   determining that it was appropriate for Fifth     12:04:15
 6   Third to maintain the exempt status of the MLO    12:04:17
 7   position.  And when you say the advice of         12:04:20
 8   outside counsel, again, you are referring to      12:04:23
 9   Exhibit 6, which is the Rob Varnell memo?         12:04:24
10          A.    Yes.                                 12:04:27
11          Q.    And is there anything else that      12:04:27
12   you are referring to there as far as advice       12:04:29
13   from outside counsel?                             12:04:31
14          A.    No.                                  12:04:32
15               MR. SELANDER:  Would you mark         12:05:04
16   this?                                             12:05:05
17               (Thereupon, Plaintiffs' Exhibit 7,    12:05:05
18   Defendant Fifth Third Bank's Statement of         12:05:05
19   Proposed Undisputed Material Facts, was marked    12:05:05
20   for purposes of identification.)                  12:05:17
21   BY MR. SELANDER:                                  12:05:17
22          Q.    The court reporter has handed you    12:05:17
23   Exhibit 7, which is Defendant Fifth Third         12:05:18
24   Bank's statement of proposed undisputed           12:05:24
25   material facts filed in this lawsuit on           12:05:26
```

MARK   WILSON 10/12/2011

| | |
|---|---|
| 1    July 18, 2011.  And I want to direct your | 12:05:31 |
| 2    attention to page seven, paragraph 12.  Midway | 12:05:40 |
| 3    towards the bottom, the sentence begins as a | 12:05:57 |
| 4    result of this audit, Fifth Third created the | 12:06:01 |
| 5    MLO position, with its own job duties and | 12:06:05 |
| 6    responsibilities, and classified the position | 12:06:07 |
| 7    as administratively exempt. | 12:06:09 |
| 8             I don't understand that sentence | 12:06:14 |
| 9    in light of the fact that you were auditing the | 12:06:17 |
| 10   position already, and it was already in | 12:06:20 |
| 11   existence.  Can you explain that? | 12:06:22 |
| 12        A.   It's the first time I'm seeing | 12:06:30 |
| 13   this, so I'm not sure what the word created | 12:06:30 |
| 14   would be since the position was already in | 12:06:37 |
| 15   place. | 12:06:40 |
| 16        Q.   It's possible it's just a typo or | 12:06:42 |
| 17   a miscommunication.  I just want to know, are | 12:06:44 |
| 18   you aware of any creation of a position with | 12:06:46 |
| 19   its own job duties and responsibilities after | 12:06:51 |
| 20   the audit was completed? | 12:06:55 |
| 21        A.   No, we did not create any | 12:06:55 |
| 22   additional positions. | 12:06:57 |
| 23        Q.   And then the next sentence says | 12:06:58 |
| 24   during this process, Mr. Wilson became familiar | 12:07:04 |
| 25   with the duties and responsibilities of the new | 12:07:07 |

MARK   WILSON 10/12/2011

Page 128

```
 1    MLO position and determined that it was          12:07:14

 2    appropriate to classify the position as          12:07:14

 3    administratively exempt under the revised FLSA   12:07:14

 4    regulations.  There was no new MLO position,     12:07:19

 5    right?                                           12:07:22

 6         A.   That's correct.                        12:07:22

 7         Q.   That's all the questions I have        12:07:23

 8    about that exhibit.                              12:07:38

 9              Going back to the declaration,         12:07:51

10    paragraph 14.  In paragraph 14, you discuss the  12:07:53

11    efforts that Fifth Third made in 2011 to         12:08:06

12    identify time worked by current MLO's over       12:08:14

13    40 hours in any week since March 24, 2010.       12:08:19

14    What went into that process?                     12:08:22

15         A.   Really working with the managers       12:08:24

16    to make an assessment of the time actually       12:08:27

17    worked.                                          12:08:30

18         Q.   So how would -- were managers          12:08:33

19    given instruction --                             12:08:36

20         A.   Yes.                                   12:08:37

21         Q.   -- on how -- how to determine the      12:08:37

22    number of hours?  What instruction was given?    12:08:46

23         A.   The instruction was to look at         12:08:46

24    productivity levels, to look at calendar         12:08:46

25    appointments, to look at results of any mid      12:08:48
```

MARK  WILSON 10/12/2011

```
 1    STATE OF OHIO         )

 2    COUNTY OF MONTGOMERY ) SS: CERTIFICATE

 3                I, Karen M. Rudd, a Notary

 4    Public within and for the State of Ohio, duly

 5    commissioned and qualified,

 6                DO HEREBY CERTIFY that the

 7    above-named MARK WILSON, was by me first duly

 8    sworn to testify the truth, the whole truth and

 9    nothing but the truth.

10                Said testimony was reduced to

11    writing by me stenographically in the presence

12    of the witness and thereafter reduced to

13    typewriting.

14                I FURTHER CERTIFY that I am not a

15    relative or Attorney of either party, in any

16    manner interested in the event of this action,

17    nor am I, or the court reporting firm with which

18    I am affiliated, under a contract as defined in

19    Civil Rule 28(D).

20

21

22

23

24

25
```

MARK   WILSON 10/12/2011

Page 138

```
1              IN WITNESS WHEREOF, I have hereunto set

2     my hand and seal of office at Dayton, Ohio, on

3     this _ _ _ _ day of _ _ _ _ _ _ _ _, 2011.

4

5                       _ _ _ _ _ _ _ _ _ _ _ _ _ _
                        KAREN M. RUDD
6                       NOTARY PUBLIC, STATE OF OHIO
                        My commission expires 5-21-2012
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```